FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 31, 2025**

Christopher M. Wolpert
Clerk of Court

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

———————————————

NORTH BREVARD COUNTY
HOSPITAL DISTRICT, d/b/a Parrish
Medical Center,

      Plaintiff - Appellant,

v.

C.R. BARD, INC.; BARD ACCESS
SYSTEMS, INC.,

      Defendants - Appellees.

No. 24-4039

———————————————

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:22-CV-00144-RJS)**

———————————————

R. Stephen Berry of Berry Law PLLC, Washington, D.C. (Brent O. Hatch of
Hatch Law Group PC, Salt Lake City, Utah; Velvel Freedman, Edward
Normand, and Richard Cipolla of Freedman Normand Friedland LLP, New
York, New York, with him on the briefs), for Plaintiff-Appellant.

Brian P. Quinn of O'Melveny & Myers LLP, Washington, D.C. (Andrew J.
Frackman and Colleen Powers, New York, New York; Sergei Zaslavsky and
Emily Murphy of O'Melveny & Myers LLP, Washington, D.C.; Andrew G. Deiss
and Corey D. Riley of Deiss Law PC, Salt Lake City, Utah, with him on the
briefs), for Defendants-Appellees.

———————————————

Before **HARTZ**, **EID**, and **FEDERICO**, Circuit Judges.

———————————————

**FEDERICO**, Circuit Judge.

_____

North Brevard County Hospital, doing business as Parrish Medical Center, filed an antitrust class action complaint against C.R. Bard, a medical device manufacturer.[1] Parrish alleged that Bard engaged in unlawful tying of products and monopolization in violation of the Sherman Act and the Clayton Act. The district court dismissed Parrish's tying claim for lack of antitrust standing and denied class certification for Parrish's monopolization claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal of Parrish's tying claim and dismiss Parrish's appeal from the denial of class certification.

## I

Bard produces a range of medical devices, including a type of catheter known as a peripherally inserted central catheter (PICC). PICCs are used to administer fluids into the bloodstream by passing through a patient's arm vein and into a vein near the heart. It is important that a PICC be precisely placed within the patient's body. Traditionally, this was done using separate chest x-rays and fluoroscopy. Today, doctors generally use a

_____

[1] According to the complaint, Bard Access Systems, the other named Defendant-Appellee, is a subsidiary and division of C.R. Bard. We therefore refer to the Defendants-Appellees as one entity "Bard" for the purposes of this opinion, just as the parties do.

tip-location system (TLS) that automatically reports the PICC's location through a combination of ultra-sound, magnetic tracking, and electrocardiography.

Parrish alleges that Bard is a leader in the TLS market and controls 70 percent market share. It also alleges that Bard has used its commanding position in the TLS market to manipulate the PICC market. Bard PICCs are sold with a proprietary tool known as a stylet that is required to integrate the PICC with a Bard TLS. If a hospital wanted to use another brand of PICC, it could not use a Bard TLS to determine the PICC's location unless the hospital also purchased a Bard PICC to use the stylet.

In simple terms, Parrish alleges that using one Bard product effectively forces hospitals to buy the other. This is known as "tying," and, under certain circumstances, it may be a violation of federal antitrust law. While Parrish did not buy Bard's TLS (the alleged tying product), it claims that Bard's practices have allowed it to monopolize the PICC market (the

alleged tied product),[2] suppressing competition and harming all buyers whether or not they purchase PICCs in conjunction with TLSs. As a result of this purported tying between PICCs and TLSs, Parrish alleges that hospitals pay 9.7 to 34.5 percent higher prices for PICCs than they would in a competitive market.

## II

In March 2020, Parrish filed suit against Bard.[3] Parrish's complaint contained two claims: illegal per se tying of separate products under Section 1 of the Sherman Act and illegal monopolization under Section 2 of the Sherman Act. *See* 15 U.S.C. §§ 1, 2. Parrish sought to certify a class

---

[2] This opinion will repeatedly distinguish between tying products and tied products. As a simple illustration to help keep them straight in mind, think of a balloon tied to a birthday cake. The buyer really wants the cake, which is the best in town. But the baker will only sell cakes on the condition that the buyer also buys her balloons, which are a separate cost. So, the balloon tags along, tied to the cake. The cake is the tying product – the product that the consumer really wants. The balloon is the tied product – the product that the consumer doesn't want but must buy to access the cake. This arrangement raises the overall cost to the buyer.

Sometimes, the tie-in is explicit, like a contract that includes a term requiring the purchase of the tied product. Other times, it is more subtle, as alleged here, when the seller requires the purchase of one product in order to use and operate another product. *See* Daniel A. Crane, *Tying Law for the Digital Age*, 99 Notre Dame L. Rev. 821, 847, 851–56 (2024) (providing historic examples of tying arrangements).

[3] Parrish originally filed in the District Court for the Northern District of New York. In February 2022, its case was transferred to the District of Utah, where Bard's PICC business is headquartered.

4

comprised of hospitals, hospital systems, and clinics that had purchased Bard PICCs, and requested damages and injunctive relief for this class under the remedial provisions of the Clayton Act. *See* 15 U.S.C. §§ 15, 26.

Parrish filed a motion for class certification, while Bard filed a motion for judgment on the pleadings. In November 2022, after hearing oral argument, the district court granted Bard's motion with respect to Parrish's tying claim. The district court found that Parrish did not have antitrust standing to bring its claim for illegal tying because Parrish did not allege that it also purchased Bard's TLS (the alleged tying product), and so Parrish did not show that it was *forced* to buy Bard's PICCs (the alleged tied product).

The district court allowed Parrish's monopolization claim to proceed. In response, Parrish filed a renewed motion for class certification. The district court, however, denied this motion. It found that Parrish's proposed class failed to meet the required elements for class certification, and that its pleadings were insufficient to establish a basis for either a damages class or an injunctive class.

Parrish petitioned for permission from this court to appeal the district court's order denying class certification. *See* Fed. R. Civ. P. 23(f) ("A court of appeals may permit an appeal from an order granting or denying class-action certification[.]") This petition was denied. As a result, Parrish then

5

moved for the district court to dismiss its monopolization claim with prejudice so that Parrish could appeal the entry of final judgment, which the district court granted. Parrish then appealed. On appeal, Bard filed a motion to dismiss the appeal from the district court's class certification order, arguing that Parrish's voluntary dismissal of the underlying monopolization claim forecloses our jurisdiction over the class certification order.[4]

### III

We review a Rule 12(c) judgment on the pleadings just as we would a Rule 12(b)(6) motion to dismiss. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009) (citation omitted). That is, we review de novo whether a plaintiff fails to plead facts that state a plausible claim. *Id.* at 1223–24. In doing so, we take all facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1171 (10th Cir. 2016) (citation omitted). Likewise, "[w]e review questions of our appellate jurisdiction de novo." *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1091 (10th Cir. 2017).

---

[4] Bard also seeks an order that Parrish pay fees and costs associated with this motion, alleging that Parrish knowingly filed an appeal that is contrary to controlling law from the Supreme Court and the Tenth Circuit.

Our disposition of this appeal begins with a general overview of substantive antitrust law before proceeding to whether Parrish has antitrust standing to pursue its tying claim against Bard. After describing the antitrust standing doctrine in broad strokes and the parties' arguments, we hold that Parrish does not have antitrust standing to pursue its tying claim against Bard because it is not an efficient enforcer of the antitrust laws in this context.

We turn next to Parrish's class certification appeal and hold that we do not have jurisdiction to review the district court's denial of class certification because Parrish voluntarily dismissed the underlying substantive claim below. We therefore grant Bard's motion to dismiss this part of the appeal. At this stage, however, we deny Bard's request for sanctions.

### A

The Sherman Act of 1890 sets out the major substantive rules of antitrust law. The Clayton Act of 1914 followed and, *inter alia*, provides private parties with relief for the violation of these rules. We begin this section by briefly describing the substantive antitrust rule that Parrish accuses Bard of

violating before turning to the Clayton Act and whether it provides a cause of action for Parrish to pursue its claim against Bard.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade[.]" 15 U.S.C. § 1. Sometimes, a tying arrangement may fall within this prohibition. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461 (1992) (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). For example, when a grocer sells sugar only on the condition that a buyer also purchases flour, the grocer has tied the purchase of flour to the purchase of

sugar and made a tying arrangement. Where a tying arrangement satisfies certain additional requirements, it may violate the Sherman Act.[5]

Under the Clayton Act, private parties may sue alleged antitrust violators and obtain treble damages or an injunction. Clayton Act, ch. 323, §§ 4 (damages), 16 (injunction), 38 Stat. 730, 731, 737 (1914) (current version at 15 U.S.C. § 15, 26).[6] But although the Clayton Act authorizes broad access to relief, "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537 (1983) (hereinafter *AGC*).

A claimed injury "must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." *Id.* at 540. "An additional factor is the directness or indirectness of the asserted injury." *Id.* Relatedly,

---

[5] The Supreme Court requires proof of other elements to ensure that antitrust enforcement is focused on conduct that is anticompetitive: the seller of the products must have "appreciable economic power" in the tying market, and the tying arrangement must affect a "substantial volume of commerce" in the tied market. *Eastman Kodak*, 504 U.S. 451, 462 (1992). *Northern Pac. Ry. Co.*, 356 U.S. 1, 7 (1958) ("[I]f one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.").

[6] The remainder of this opinion, like most antitrust cases, will cite to the Clayton Act using the section numbers found in the session law, not the United States Code.

"[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to sue. *Id.* at 542. These principles, along with others not relevant here, together describe the doctrine known as antitrust standing, which a plaintiff must satisfy to obtain relief under the Clayton Act.[7]

This court has distilled the Supreme Court's caselaw into the following rule for antitrust standing: "a plaintiff must show (1) an 'antitrust injury;' and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Sports Racing Services, Inc. v.*

---

[7] The Supreme Court has explained that the term "standing" can be misleading when used to refer to statutory or "prudential" standing. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125, 128 n.4 (2014). Whereas constitutional standing is jurisdictional, statutory standing really refers not to the jurisdiction of the court, but rather to "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127. Antitrust standing is a breed of statutory standing. *Id.* at 126. The phrase "antitrust standing" could be similarly misleading, but since our cases and the parties uniformly use this phrase, we will do the same.

*Sports Car Club of America, Inc.*, 131 F.3d 874, 882 (10th Cir. 1997).[8] We explained that with respect to the first element, "the standing analysis must take into account the type of antitrust claim being asserted." *Id.* Where the plaintiff asserts an antitrust injury based on a tying claim, "two types of parties may have standing . . . the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying plaintiff), and the competitor who is restrained from entering the market for the tied product." *Id.* at 887.

In *Abraham v. Intermountain Health Care Inc.*, this court rearticulated the second element of the antitrust standing analysis: the causal connection between the antitrust injury and the defendant's

---

[8] *Sports Racing* is a Clayton Act § 4 case – that is, it described the rule of antitrust standing with respect to compensatory damages, not injunctive relief. Our cases, however, have not made a distinction between § 4 (damages) and § 16 (injunctions) cases with respect to these two elements of antitrust standing analysis. *See, e.g.*, *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653, 667 (10th Cir. 2006) (acknowledging that more than antitrust injury is required in order to establish antitrust standing even for injunctive relief); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995) (enumerating factors relevant to second element of antitrust standing analysis without distinguishing the relief sought). Even if it were otherwise, however, Parrish has not argued that there is any material difference between antitrust standing for damages and injunctive relief. As Bard correctly points out, then, the matter is waived. *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019). We therefore assume for the purposes of this case that *Sports Racing* applies regardless of the relief sought.

unlawful conduct must be direct enough to demonstrate that the plaintiff "is an efficient enforcer of the antitrust laws." 461 F.3d 1249, 1268 (10th Cir. 2006). "Factors to be considered in this analysis include the directness or remoteness of the injury suffered by the plaintiff, which, in turn, depends on the existence of other more directly-injured possible plaintiffs." *Id.* (citing, *inter alia*, *AGC*, 459 U.S. at 542). We held that the existence of other parties who "would be more directly harmed by" the anticompetitive conduct will ordinarily defeat a plaintiff's antitrust standing. *Id.*

Our cases therefore establish the following framework: to obtain a private antitrust remedy under the Clayton Act, plaintiffs must establish an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful[.]" *Black v. Occidental Petro. Corp.*, 69 F.4th 1161, 1175 (10th Cir. 2023) (citation omitted). An antitrust plaintiff "must also demonstrate that it is an efficient enforcer of the antitrust laws." *Abraham*, 461 F.3d at 1268. These two requirements faithfully apply the overarching principle: only plaintiffs who best vindicate "the central interest in protecting the economic freedom of participants in the relevant market" have a right to sue under the Clayton Act. *AGC*, 459 U.S. at 538; *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109 (1986); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

12

The district court in this case held that Parrish lacked antitrust standing under the first element of our test, antitrust injury. The district court read our precedent – specifically *Sports Racing* – as setting out an exhaustive list of potential plaintiffs who have an antitrust injury sufficient to challenge tying arrangements: "the purchasers who were forced to buy the tied product to obtain the tying product, and the competitor who is restrained from entering the market for the tied products." Aplt. App. I at 202–03. In other words, *Sports Racing*, as interpreted by the district court, establishes a categorical rule excluding plaintiffs who bought only the tied product, and not the tying product. Because Parrish purchased only the tied product here, the district court relied on *Sports Racing* to reject Parrish's antitrust standing.

Parrish disputes this reading of our cases. It argues that because tying arrangements allow the seller to compel purchases of the tied product, direct purchasers of the tied product are forced to pay higher prices in the market and that alone suffices to demonstrate an antitrust injury. *Sports Racing* neither considered nor decided this argument, according to Parrish, so that case should not be read to control this case. And Parrish argues *Sports Racing* did not purport to set forth a categorical list of plaintiffs, excluding all others, who have the right to challenge tying arrangements under the Clayton Act.

Bard responds by agreeing with the district court that *Sports Racing* dictates the outcome here. According to Bard, *Sports Racing* announced a "rule" that two types of plaintiffs have antitrust standing: tying product purchasers and competitors. Additionally, Bard argues that *Sports Racing*'s rule was necessary to its outcome: without a rule excluding tied product purchasers, *Sports Racing* would not have needed to relax the direct purchaser requirement so that the tying product purchaser in that case could proceed.

Taking these arguments into account, we instead resolve this case on an alternative ground. The district court did not analyze the second element of the antitrust standing analysis, efficient enforcer, because it granted Bard's Rule 12(c) motion based on the first element. Nor did Parrish address the second element in its opening brief. That said, we are free to affirm on any basis supported by the record, even if it was not reached by the district court or addressed by the parties before us. *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). Indeed, we commonly and properly do so, for as we said in *Richison*, the courts of appeals stand "ready to affirm whenever the record allows." *Id*. For several reasons, we reach and decide this appeal based upon the efficient enforcer element.

First, the parties did brief the second element, after Bard raised it as an alternative basis to affirm in its response brief. Second, because we have

14

enough information before us to decide the issue, reaching it now would prevent this case "from needlessly bouncing back and forth between" us and the district court. *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016). And third, as mentioned above, our application of the second element of antitrust standing is closely related to our interpretation of the first element. We therefore discuss the efficient enforcer element of our antitrust precedent, hold that Parrish is not an efficient enforcer, and affirm the district court's Rule 12(c) order on that basis.

### B

As we have recounted, *Sports Racing* held that in addition to antitrust injury, a plaintiff must show "a direct causal connection between that injury and a defendant's violation of the antitrust laws." 131 F.3d at 882. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *AGC*, 459 U.S. at 542. In other words, we infer from the existence of more directly injured parties that the plaintiff before us is indirectly, or at least less directly, injured. This inference is consequential because antitrust standing is not merely a question of whether we have before us a proper plaintiff, but rather

whether we have an "effective" plaintiff. *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653, 667 (10th Cir. 2006).[9]

The rationale for this procedural requirement is rooted in substantive antitrust law. Generally, antitrust laws "were enacted for 'the protection of competition, not competitors[.]'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Put differently, the substantive prohibitions on anticompetitive conduct are concerned not with "its effect upon any individual in the marketplace, but rather [] its effect generally upon competition in a particular market." Daniel C. Richman, Note, *Antitrust Standing, Antitrust Injury, and the Per Se Standard*, 93 Yale L.J. 1309, 1310 (1984). Thus, we "have required the plaintiff . . . to relate his private injury to a more public wrong – a threat to competition in his own market."

---

[9] The efficient enforcer element of the antitrust standing inquiry is necessarily comparative. But we caution that district courts should not end a plaintiff's suit solely because it is not the *best*, *most* effective, or *most* efficient plaintiff. The Clayton Act's promise of "justice to every man, whenever he may be injured by those who violate the antitrust laws," would hardly be vindicated if only one plaintiff in the world had antitrust standing to sue. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977). The efficient enforcer element does not require a plaintiff to exclude all others to then seek relief. There will be instances (maybe many) where even a "second-best" or third-best plaintiff is an efficient enforcer of the antitrust laws. *SAS of Puerto Rico, Inc.*, 48 F.3d at 44. Even so, the efficient enforcer element is more exacting than the antitrust injury element. Antitrust injury alone is insufficient to state a cause of action.

*Id.* at 1312. The "broad principle of compensation" under the Clayton Act is therefore qualified by a second element of antitrust standing. *Id.*

We held in *Abraham* that the second prong of the antitrust standing inquiry requires a plaintiff to show "that it is an efficient enforcer of the antitrust laws." 461 F.3d at 1268. "Factors to be considered in this analysis include the directness or remoteness of the injury suffered by the plaintiff, which, in turn, depends on the existence of other more directly-injured possible plaintiffs." *Id.* Other factors that may bear on the question include the defendants' motivations, "the speculative nature of the damages sought," and "the risk of duplicative recoveries or complex damages apportionment." *Sharp*, 967 F.2d at 406–07.

Bard argues that Parrish's alleged antitrust injury is too distantly removed from the alleged antitrust violation. Relying on *Sports Racing*, Bard points out that it is the tying product purchasers who are the "targeted victims of an illegal tying arrangement." Resp. Br. at 34 (quoting *Sports Racing*, 131 F.3d at 889 n.15). Parrish, by contrast, does not experience market restraint to the same extent as victims who purchase both the tied and tying product because only those victims experience the "lack of choice" that tying arrangements induce. *Id.* Parrish responds that the causal connection between its antitrust injury and the alleged antitrust violation

is straightforward: because of the tying arrangement, Parrish must pay supracompetitive prices for the tied product.

On this point, we agree with Bard. *Sports Racing* held that in the usual case, "tying product purchasers . . . are in the *best* position to identify an illegal tie and have the most incentive to bring an action to enforce the prohibition against tying." 131 F.3d at 889 n.15 (emphasis added). Although both the tied-product purchaser and the tying-product purchaser may experience an anticompetitive harm, Parrish does not contest that the tying-product purchaser experiences the harm to a greater extent. Thus, ordinarily it is the tying product purchaser whose self-interest is best aligned with the public interest, and therefore best positioned "to perform the office of a private attorney general." *AGC*, 459 U.S. at 542.

Parrish fails to persuade us that this is the rare case where tied-product purchasers are the efficient enforcer plaintiff as opposed to tying-product purchasers or competitors. Parrish claims that "the standard for antitrust causation is low," citing out of circuit precedent. Reply Br. at 10–11. While that may well be true with respect to the antitrust injury element, Parrish's claim is irreconcilable with the efficient enforcer element. Parrish further argues that our task is "only to determine whether Parrish has *adequate* standing." *Id.* at 12. But we foreclosed this argument in *B-S Steel*, 439 F.3d at 667, as did the Supreme Court in *AGC*, 459 U.S. at 542. Finally,

we are aware of at least one case where a competitor *did* sue Bard and litigated its claims all the way through trial. *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273 (N.D.N.Y. May 5, 2021), (denying cross-motions for summary judgment); Judgment in a Civil Case, *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2022 WL 18402240 (Oct. 6, 2022) (No. 1:17-cv-00598) (jury verdict in favor of Bard). The fact that Bard has already faced a competitor suit diminishes any concern that affirmance would leave an enforcement gap and underscores that there are other plaintiffs who are better positioned to enforce the antitrust laws. Parrish points to no other factor favoring its right to sue.

In a footnote, Parrish claims the district court found that Parrish was an efficient enforcer with respect to its monopolization claim, and that Bard conceded that the question of whether Parrish was an efficient enforcer of the monopoly claim would be the same or overlap with the question of whether Parrish was an efficient enforcer of the tying claim. But *Sports Racing* holds that a plaintiff may be an efficient enforcer for one antitrust purpose but not another. 131 F.3d at 884–85, 889 n.15. The district court's later findings with respect to monopolization (which are not binding on us in any event) do not prevent us from finding otherwise with respect to the tying claim. Moreover, we do not understand Bard's purported concession to stand for anything more than antitrust standing for a monopolization

claim is "obviously related to but analytically distinct from the tying claim." *Id.* Monopolization and tying claims are related, but each survives, or not, on its own terms.

Here, Parrish's tying claim does not survive. Parrish is not an efficient enforcer of the antitrust laws and therefore does not have antitrust standing to sue Bard for its alleged per se violation of Section 1 of the Sherman Act for the product tying arrangement.

### III

In addition to the tying claim, Parrish also alleged a monopolization claim in the district court under Section 2 of the Sherman Act. After the district court declined to certify a class for this claim, and we thereafter declined discretionary interlocutory review, Parrish voluntarily dismissed with prejudice its monopolization claim to induce an appealable final judgment. Parrish now seeks our review of the district court's order denying class certification. But Supreme Court and Tenth Circuit precedent foreclose our jurisdiction over the class certification order, so we cannot consider it.

We have mandatory jurisdiction over "appeals from all final decisions" of the district court. 28 U.S.C. § 1291. Our jurisdiction over a final judgment extends to all interlocutory orders that merge into the final judgment. *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 985 (10th Cir. 2021).

20

But not all interlocutory orders merge. Where a plaintiff abandons remaining substantive claims to obtain immediate review as of right over a class certification denial, the Supreme Court has held that there is no jurisdiction over the class certification denial. *Microsoft Corp. v. Baker*, 582 U.S. 23, 27 (2017). This voluntary dismissal tactic "subverts the final-judgment rule," "invites protracted litigation," and "undercuts Rule 23(f)'s discretionary regime." *Id.* at 37, 39.

Applying *Baker*, we have held that when a plaintiff voluntarily dismisses their claims with prejudice and then seeks appellate review of a class certification denial order, that order does *not* merge with final judgment, and our § 1291 jurisdiction therefore does not extend to the order. *Anderson Living Trust v. WPX Energy Production, LLC*, 904 F.3d 1135, 1144–45 (10th Cir. 2018).[10] Parrish's appeal from the district court's class certification order falls neatly within the scope of this rule and we therefore have no jurisdiction to consider it.[11]

---

[10] The fact that the plaintiffs in *Anderson Living Trust* settled their individual claims before voluntary dismissal was immaterial to this court's holding that *Baker* applies.

[11] We also decline to exercise pendent appellate jurisdiction over the district court's class certification order because it is neither "inextricably intertwined with" nor "necessary to ensure meaningful review of" the district court's Rule 12(c) order dismissing Parrish's tying claim. *Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019).

Also pending before us is Bard's motion to dismiss this portion of the appeal relating to the class certification denial order. Doc. 23-1; *see also* Fed. R. App. P. 27; 10th Cir. R. 27.3(A)(1). Because we dispose of this argument in a way that provides part of the primary relief Bard requested, we therefore grant Bard's motion to dismiss insofar as it seeks dismissal of the appeal from the district court's order denying class certification. 10th Cir. R. 2.1 (we have discretion to overlook technical errors under our local rules). However, at this point we deny Bard's request for associated fees and costs, which must be sought by a "separately filed motion." Fed. R. App. P. 38. Our denial of Bard's request is without prejudice to any renewed request Bard may make post-judgment in accordance with applicable rules.

## IV

Although we diverge from the rationale for the district court's decision, we AFFIRM its bottom line. Parrish does not have antitrust standing to pursue its tying claim against Bard. Parrish's remaining claims of error are DISMISSED for lack of appellate jurisdiction.

No. 24-4039, *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc., et al.*
**FEDERICO**, Circuit Judge, concurring.

        Although I join with my colleagues in the opinion of the court, I also write separately to address and discuss the injury element of antitrust standing, which was the sole basis for the district court's decision dismissing Parrish's tying claim. The parties' arguments on this legal question present a confounding understanding of our antitrust injury precedent. The district court, relying upon *Sports Racing Services, Inc. v. Sports Car Club of America, Inc.,* 131 F.3d 874 (10th Cir. 1997), interpreted our caselaw to strictly exclude parties who purchase only tied products as tying claim plaintiffs. However, consistent with first principles of antitrust law, our case law sets forth a broad, flexible rule of antitrust standing.

        This court's failure to reach and decide this critical issue is not an exercise of prudence. I first address our need to clarify this important element of antitrust law – if not in this case, then in a future one. I then explain why the district court's decision, though understandable, was erroneous. Neither *Sports Racing* nor any subsequent case sets forth the kind of categorical rule excluding plaintiffs who purchase only the tied product from the antitrust laws' remedial protections. In my view, district courts should read our antitrust cases contextually and in harmony with the general corpus of antitrust law, not against it.

**I**

The existential purpose of appellate courts is the duty to correct legal errors made by the district court. As an incident to this error-correcting duty, appellate courts also serve "the institutional function of announcing, clarifying, and harmonizing the rules of decision employed by the legal system in which they serve." *Matter of McLinn*, 739 F.2d 1395, 1401 (9th Cir. 1984). We do not perform these functions in the abstract. The appellate judge is not a "knight-errant," tasked to sally forth and correct errors and announce rules at will. Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921). But where, as here, such errors are properly brought before us, we should rightly correct them and expound our reasons for doing so.

Parrish argues that the district court committed an error, which was the sole basis for the decision on antitrust standing that we were tasked to review. On appeal, this claimed error was fully briefed by all parties. It is within our jurisdiction to consider whether the district court erred here. And having properly invoked our jurisdiction to address this issue, Parrish has also triggered our "virtually unflagging" duty to say what the law is. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). The court's decision to resolve this appeal on alternative grounds certainly does not deprive us of the authority to address the error

2

that Parrish complains of. If this court has the discretion to affirm on any basis supported by the record, we also have the discretion to decide the issue that was reached by the district court, is fully briefed by the parties, and is thereby central to the appeal before us. In my view, that was the correct way to proceed in deciding this appeal.

First, the parties' arguments set out opposite interpretations of the rule in *Sports Racing* (one of which aligned with the district court's reasoning), which illustrates there is uncertainty or confusion concerning how that decision applies in other market contexts. By looking the other way, we now add to the uncertainty and confusion that has been directly brought to our attention.

That uncertainty and confusion is particularly intolerable with respect to antitrust law. Antitrust law relies on highly simplified, common-law-esque rules of decision and decentralized enforcement. That is why courts applying antitrust principles must articulate clearly the law's expectations as to regulated parties. *See* A. Douglas Melamed, *Antitrust Law and Its Critics*, 83 Antitrust L.J. 269, 271–74 (2020) *(*observing that antitrust "principles and rules are largely made by judges."). This case smacks of confusion about our precedent, so there is a compelling need to address it.

Second, our application of the second element of antitrust standing (efficient enforcer) is closely related to our interpretation of the first element (antitrust injury). Indeed, before *Sports Racing*, the Supreme Court articulated efficient enforcement as merely one factor in a holistic inquiry, rather than a two-step test. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–45 (1983). Thus, it makes good sense in this case to also consider antitrust injury so that we may properly analyze whether Parrish has standing as an efficient enforcer. But in failing to address the antitrust injury element, the court's opinion leaves regulated entities and district courts to speculate as to our antitrust injury rules, which will collaterally affect the efficient enforcement analysis, given the strong ties between these doctrines.

Although I join and respect my colleagues' decision to travel down another, narrower path of decision, I am concerned that by doing so we have also needlessly added to the uncertainty regarding the antitrust injury element. Our decision should address the properly presented, fully briefed, and central issue of whether the district court erred in its interpretation of our antitrust injury precedent. Our failure to do so leaves the parties, the district court, and this court in impoverished circumstances. I write separately with the goal to narrow the gap between uncertainty and clarity

and turn now to the antitrust injury element that we should have addressed.

## II

Because the parties' arguments turn so heavily on our language and reasoning in *Sports Racing*, I will first examine that case in more detail. I will then turn to the parties' arguments and conclude that Parrish has the better read of our cases.

Before diving into *Sports Racing*, it is worth observing that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). That is especially true in the antitrust context, where common law-type adjudication prevails. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007).

### A

*Sports Racing* involved a unique set-up. The Sports Car Club of America required all racers who wished to participate in its car races to purchase specialty cars and car parts from an authorized third-party distributor. *Sports Racing,* 131 F.3d at 878. The third-party distributor, in turn, purchased the specialty cars and parts from the Club itself. *Id.* By tying participation in car races to the purchase of cars and parts, the Club was able to charge higher prices for cars and parts and establish a monopoly

5

in that market. *Id.* at 879. Two plaintiffs – a car racer and a distributor – sued the Club for antitrust violations.[1] *Id* at 878–79. As to the tying claim, we held that both plaintiffs had antitrust standing.

The distributor had antitrust standing because it was a "potential competitor," or at least, at the summary judgment stage, had raised a genuine dispute as to whether it was a "potential competitor." *Id.* at 887. The car racer had bought both the tied and the tying product and so had to pay higher prices. *Id.* Thus, we said: "[r]elevant to plaintiffs' claim, two types of parties may have standing to challenge illegal tying arrangements – the purchasers who are forced to buy the tied product to obtain the tying product (the prototypical tying plaintiff), and the competitor who is restrained from entering the market for the tied product . . . Both types of plaintiffs are present here[.]" *Id.*

But the racer-plaintiff had a problem. Longstanding precedent restricted antitrust suits to plaintiffs who purchase the relevant product directly from the defendant. *Illinois Brick Company v. Illinois*, 431 U.S. 720, 729–36 (1977); *Apple, Inc. v. Pepper*, 587 U.S. 273, 277 (2019). The racer bought access to the races (tying product) directly from the Club, but

---

[1] The racer (Freeman) was also the sole owner of the distribution company (SRS). *Sports Racing*, 131 F.3d at 878.

because the Club required all racers to buy their cars and parts (tied product) from an authorized third-party distributor, the racer did not directly purchase the tied product from the Club – indeed, no racer ever could. *Sports Racing*, 131 F.3d at 889. There was thus no direct purchaser of both the tying and the tied product.

We relaxed the direct purchaser rule and held that it was sufficient that the Club had a "direct economic interest" in the sale of the tied product to the racer, even though it did not directly sell the product to him. *Id.* at 888–89. Our analysis was driven in large part by the fact that the "only other possible" direct purchaser of the tied product was the distributor aligned with the Club. *Id.* at 889 n.15. But that distributor was neither tied nor injured by the tie. *Id.* We said: "[b]ecause the tying product purchasers (here, the purchasers of racing services) are the targeted victims of an illegal tying arrangement, these purchasers are in the best position to identify an illegal tie and have the most incentive to bring an action to enforce the prohibition against tying." *Id.*

## B

With the context and key aspects of *Sports Racing* now in view, I turn to the task of discerning whether, as Bard argues, *Sports Racing* categorically forecloses the suit brought by Parrish. Even if Parrish is correct that the district court misinterpreted *Sports Racing*'s language, I

7

am sympathetic to the district court's dilemma. There is certainly language in *Sports Racing* that leans in Bard's favor.

First, there is the list, where we appeared to suggest that only purchasers of both the tied and the tying product and competitors have antitrust standing to challenge tying arrangements. *Id.* at 887. Second, there is footnote 15 in the opinion, where we expressly rejected the possibility that the tied product purchaser could challenge the tying arrangement. *Id.* at 889 n.15. But I am persuaded that our precedent does not set forth a categorical rule that automatically excludes tied product purchasers from the list of potential plaintiffs who have suffered an antitrust injury.

To begin with, the "list" of potential antitrust plaintiffs does not enumerate an *exclusive* set of entities who may challenge tying arrangements. As Parrish correctly points out, context points the other way. We qualified the pertinent statement in *Sports Racing* by acknowledging that the list was only as "[r]elevant to plaintiffs' claim." *Id.* at 887. Restricting our discussion of antitrust standing to those archetypes "relevant to plaintiffs' claims" signaled two things: 1) the unique market arrangement in *Sports Racing* implicated those two types of possible plaintiffs, and only those two types; and 2) we did not intend to approve or disapprove *other* types of potential plaintiffs because those other types, not

8

present in the case, were not relevant to plaintiffs' claims. I therefore do not read this language in *Sports Racing* to consider or decide the question of whether a plaintiff who buys only the tied product has suffered an antitrust injury sufficient to confer standing to challenge a tying arrangement in all cases.

Bard asks us to adopt a maximalist reading of footnote 15 to exclude all tied product purchasers from Clayton Act suits, but again, I conclude that context demands a narrower interpretation of the rule from that case. The tying arrangement in *Sports Racing*, by the court's own terms, was "not a typical tying situation." *Id.* at 887. The structural role of third-party distributors in the tying arrangement made it a unique market, and *Sports Racing* merely recognized this fact. Because the distributor was not, practically speaking, a true consumer of the tied product, it was not the truly injured party. *Id.* at 889 n.15; *see also Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 11 (1st Cir. 1999) ("[A] commercial intermediary, such as a distributor or sales representative, generally lacks standing because its antitrust injury is too remote."). But this determination was made without distinction between tied and tying product purchasers.

Moreover, the last sentence of footnote 15 strongly suggests that it is foreshadowing the efficient enforcer element of the antitrust standing analysis, not opining on the antitrust injury element. Recall that we said:

"Because the tying product purchasers (here, the purchasers of racing services) are the targeted victims of an illegal tying arrangement, these purchasers are in the *best position* to identify an illegal tie and have the *most incentive* to bring an action to enforce the prohibition against tying." *Sports Racing*, 131 F.3d at 889 n.15 (emphasis added). The court's focus on the best positioned party with the most incentive to sue for an antitrust violation fits neatly with the efficient enforcer requirement we described in *Abraham v. Intermountain Health Care Inc.*, as part of the second element in the antitrust standing analysis. 461 F.3d 1249, 1268 (10th Cir. 2006). So, although there is some ambiguity in footnote 15's analysis, I read it to address the second element of antitrust standing concerning efficient enforcement.

Additionally, the district court relied on footnote 10 of *Abraham*, where without further reasoning we quoted *Sports Racing* to reject the antitrust standing of the plaintiffs there. 461 F.3d 1249, 1266 n.10 (10th Cir. 2006)) But in *Abraham*, the plaintiffs did not buy any products at all – they were competitors. 461 F.3d at 1266 n.10. Indeed, *Abraham* actually supports Parrish's reading of the caselaw, because it suggests that had the *Abraham* plaintiff purchased the tied product, the result might have been different. *Id.* ("As the Plaintiffs neither purchase nor provide SEC [the tied product], they lack standing to assert this claim."). Also, by tucking this

10

language in a footnote only, the *Abraham* court treated this principle of law as an aside. The language is at minimum ambivalent about antitrust injury and at most supports the view that purchasers of tied products alone can have antitrust standing in the appropriate circumstances. That perhaps explains why Bard did not respond to Parrish's arguments about *Abraham* in its response brief.

In all, I do not read *Sports Racing* or any of our other cases to set forth a categorical rule excluding plaintiffs who purchase only the tied product from challenging a tying arrangement. My interpretation of *Sports Racing* is consistent with the Supreme Court's repeated rejection of "formalistic distinctions" in the interpretation and implementation of the antitrust laws. *E.g.*, *Eastman Kodak Co.*, 504 U.S. at 466–67. We have also acknowledged that "the Supreme Court has avoided black-letter rules about antitrust standing." *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406 (10th Cir. 1992). Bard's position requires us to assume that we silently but sharply departed from this norm in *Sports Racing*. Bard offers no explanation for why we would have inexplicably abandoned this norm, and I think that assumption is implausible.

My interpretation of *Sports Racing* also minimizes any divergence from our sister circuits. In *Ware v. Trailer Mart, Inc.*, the Sixth Circuit rejected the argument that because a plaintiff declined to participate in the

11

tying arrangement, he lacked antitrust standing to challenge a tying arrangement. 623 F.2d 1150, 1153 (6th Cir. 1980). It explained "that this argument begs the question. [Plaintiff] has alleged a wrongful deprivation of money[.] He incurred this loss because of [Defendant's] anticompetitive conduct[.]" The Sixth Circuit "therefore [found] that [Plaintiff] has properly claimed an injury under Section 4 and may, accordingly, sue to recover damages for the alleged violations of Section 1 of the Sherman Act." *Id.* Whatever the factual distinctions between *Ware* and this case, the rule of antitrust injury that the Sixth Circuit applied is certainly more capacious than the one Bard asks us to adopt via *Sports Racing*.

Additionally, in *Novell, Inc. v. Microsoft Corp.*, the Fourth Circuit rejected a rule of antitrust injury that would have turned on the plaintiff's status instead of a more holistic, fact-bound inquiry. 505 F.3d 302, 310–14 (4th Cir. 2007). Relying on circuit precedent like Bard does here, Microsoft asked the court "to adopt a bright-line rule that only consumers or competitors in the relevant market have antitrust standing." *Id.* at 311. Such a rule would have excluded Novell, which was neither. *Id.* at 308. But the Fourth Circuit declined Microsoft's invitation to potentially bring circuit precedent into conflict with the Supreme Court. *Id.* at 311–14. Although *Novell* did not involve a tying claim, it set forth a general holding with respect to antitrust standing that would encompass tying claims and

foreclose Bard's argument. My rejection of Bard's categorical interpretation of our caselaw is therefore in harmony with at least the Fourth and Sixth Circuit. I am aware of no precedent to the contrary.[2]

In sum, I do not read *Sports Racing* as setting forth a brightline, categorical rule of antitrust injury that constructs a permanent wall between tying and tied product purchasers. Direct purchasers of only tied products may sometimes have an antitrust injury and therefore satisfy the first element of our antitrust standing inquiry. Any language in *Sports*

---

[2] Although the argument that Parrish raises does not appear to be directly resolved by other courts, nearly all the circuits caution against black letter or brightline rules for antitrust standing. *See, e.g.*, *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 43–44 (1st Cir. 1995); *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264–65 (3d Cir. 1998); *Los Angeles Memorial Coliseum Com'n v. National Football League*, 791 F.2d 1356, 1363 (9th Cir. 1986) (no "mechanical tests"); *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1450–51 (11th Cir. 1991). So too have district courts declined to apply hard and fast rules for antitrust standing, sometimes in cases analogous to this one. *See, e.g.*, *Warner Management Consultants, Inc. v. Data General Corp.*, 545 F. Supp. 956, 967 (N.D. Ill. 1982); *Heartland Payment Systems, Inc. v. MICROS Systems, Inc.*, 2008 WL 4510260, at *11 (D.N.J. Sept. 29, 2008). I am therefore satisfied that Bard's position is contrary to the majority position of the circuit courts. Were I firmly convinced that Bard is nonetheless correct about the law or the state of our precedent, this court would be duty-bound to depart from our sister circuits. But the consensus of our sister circuits (even at a high level of generality) is good evidence of the correct interpretation of the law, and here, we are offered little more than a strained interpretation of one of our cases as a basis to break from that consensus – too thin a reed to bear the weight of a possible circuit split. *United States v. Thomas*, 939 F.3d 1121, 1130–31 (10th Cir. 2019).

*Racing* to the contrary is best read as addressing antitrust standing's second element, the efficient enforcer requirement.[3]

## III

Almost four decades ago, the Seventh Circuit observed that the "issue of antitrust standing has become somewhat confused." *Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1201 (7th Cir. 1986). To the extent that confusion persists about our precedents, which seems obvious given how this case was presented and the district court's decision that we are reviewing in this appeal, we should not side-step our obligation to attempt to provide clarity.

I would hold that *Sports Racing* does not categorically foreclose antitrust challenges to tying arrangements that are brought by plaintiffs who have purchased only the tied product. Instead, our law establishes a broad, flexible, and fact-bound standard for antitrust standing: the plaintiff must show that 1) they bear an antitrust injury; and 2) they are an efficient enforcer of the antitrust laws. *Sports Racing* does not establish any brightline rule under either of these elements, but with respect to the latter, *Sports Racing* and other

---

[3] The panel opinion is correct to hold that Parrish fails to demonstrate that it is an efficient enforcer of the antitrust laws in this context. But since I would have held that tied product purchasers can, in some instances, have an antitrust injury sufficient to challenge a tying arrangement, my concurrence should not be construed to foreclose the possibility that, in a future case, a tied product purchaser could have an antitrust injury and also be an efficient enforcer of antitrust law.

precedent requires that tied-product purchasers show why they are efficient enforcers against tying arrangements, when tying-product purchasers and competitors are usually more directly injured. Here, Parrish has not met this burden. I respectfully concur in the opinion of the court and the affirmance of the district court's judgment.

24-4039, *N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc., et al.*
**HARTZ**, J., concurring

I join the opinion of Judge Federico for the court. As for his concurring opinion, I would be inclined to agree with his reading of *Sports Racing*, but I think we are bound by footnote 10 in *Abraham*, which I view as rejecting that reading.